### SHEA *v.* SILLER.

1. Contracts—Care and Maintenance—Cancellation of Instruments—Burden of Proof.

> In suit to cancel, on ground of mental incompetency, contract for care and maintenance of plaintiff's aged decedent in consideration of his turning over to defendant certificate of deposit, burden of proof was on plaintiff.

2. Same—Mental Competency—Evidence—Sufficiency.

> Finding of trial court that evidence was insufficient to establish decedent's mental incompetency, *held,* justified by record.

3. Same—Fraud—Mere Opportunity for Fraud Insufficient.

> To justify cancellation of contract for care and maintenance of aged decedent, it is not sufficient merely to prove that there was opportunity to perpetrate fraud, or that decedent was of less than average mentality; nor is it of great importance that, as situation subsequently developed, contract seemingly worked more to advantage of one party than the other.

4. Witnesses—Matters Equally Within Knowledge of Deceased.

> In suit to cancel contract for care and maintenance of plaintiff's aged decedent, testimony of defendant's son was not barred as being equally within knowledge of deceased, on theory that son acted as defendant's agent (3 Comp. Laws 1929, § 14219).

5. SAME—CROSS-EXAMINATION—WAIVER.
>Statutory bar, if any, to testimony by defendant's son, as being equally within knowledge of deceased, *held*, waived by plaintiff's cross-examination of said witness.

Appeal from Houghton; Stone (John G.), J. Submitted January 11, 1933. (Docket No. 96, Calendar No. 36,858.) Decided March 2, 1933.

Bill by Abbie Shea, as administratrix of the estate of Timothy Downey, deceased, against Edward F. Siller to set aside a contract for care and maintenance. Bill dismissed. Plaintiff appeals. Affirmed.

*Galbraith & McCormack* (*M. E. Louisell*, of counsel), for plaintiff.

*B. H. T. Burritt*, for defendant.

NORTH, J. Timothy Downey died February 19, 1929, being upwards of 70 years of age. On November 14, 1928, he entered into a contract with the defendant, Edward F. Siller, for his care and maintenance during the remainder of his life and for suitable burial. As a consideration for this undertaking on the part of the defendant, Downey turned over to him a certificate of deposit for $8,436.94 in the First National Bank of Hancock. Plaintiff, as administratrix of the estate of Timothy Downey, deceased, filed the bill of complaint herein and seeks cancellation of the Siller contract on the ground that Downey was mentally incompetent at the time of its consummation. An accounting is also sought. By decree in the circuit court plaintiff's bill of complaint was dismissed, and she has appealed. The outcome of this appeal is dependent upon a review of the issue of fact as to whether at the time of enter-

ing into the contract the deceased was mentally competent.

Timothy Downey was born in Ireland. He came to this country when comparatively young, and for some years worked in mines in the west; but for approximately 35 years preceding the fall of 1927 he worked as a general helper in foundries in northern Michigan. In the later years of his life he resided at a boarding house or hotel known as the Northwestern, at Hancock, Michigan. In habits and conduct he was peculiar. He seems to have mingled with his fellow workmen in a less degree than was common among the others. He was in the habit of talking or mumbling to himself, and while so talking or singing he would chuckle or laugh; and frequently made gestures with his hands, which at times were somewhat violent. He carried his noonday luncheon to work and was accustomed to eating apart from the other employees, although he sometimes associated with them after eating. Because of his attitude and unusual conduct, other employees teased and aggravated him, which at times led him to become somewhat violent. However, it does not appear from the record that he ever injured any one, but orders were given that no one should tease him while at work. He seems to have kept careful account of the time he worked and of the amount of wages due him. On one or two occasions he was successful in convincing his employer that he had been underpaid. He was very careful with his money, seems to have been a regular depositor at the First National Bank of Hancock, where he had both a savings account and a certificate of deposit. He left his employment at the factory in October, 1927, apparently on account of impaired health and advancing years; but he continued to room at the

hotel and to take his meals at the restaurant operated in connection therewith. He had few, if any, intimates, and rarely indulged in any considerable conversation; though he was inclined to talk in an intelligent manner with other employees at the foundry about the days he had spent in the West and concerning pioneers in the mining business of Montana. So far as others observed, he rarely read newspapers, books, or magazines.

Decedent seems to have had one rather close friend in the person of Henry O'Leary, who was in the habit of calling upon him quite frequently. On December 12, 1927, O'Leary went to Downey's room and found him apparently seriously ill. He was sitting or lying on a radiator with his coat collar turned up, although there was no heat in the radiator. Dr. LaBine, the county physician, was called and Downey was removed to the hospital, where he remained for nearly two months. Dr. LaBine testified that at this time Downey's feet were swollen, and he was suffering from decompensation of the heart. At the time of his removal to the hospital, Downey took with him a leather bag containing 11 bundles of United States currency rolled and tied with a cord, each containing $100, and also $50 in gold. The doctor and O'Leary had this money placed in safekeeping at the hospital. Upon Downey's release, the amount of his doctor's bill and hospital expenses was taken out of this money, and some used to buy him clothing. The doctor and O'Leary accompanied Downey to the bank, and practically all of the balance was placed in his savings account. While at the hospital, Downey inquired and was much concerned about the expenses being incurred, and complained because he was deprived of the possession of his money; though Dr. LaBine testified

that Downey did not utter a complete sentence during the whole time he was at the hospital. At the time the expense of his sickness was paid out of this money, Downey complained that the charge was "too much, too much." The testimony discloses that Downey was careless about his personal habits and appearance. His clothes were not clean, and some of the witnesses referred to him as wearing clothing that was dirty and filthy, and permitting his hair to grow excessively long. At the time he was taken to the hospital, O'Leary procured some necessary new garments for him and engaged a barber to shave Downey and cut his hair. When he was released from the hospital, February 6, 1928, he was completely outfitted with new clothes, shoes, underwear, shirt, and other necessities. He returned to the hotel to live as before; and his conduct relative to talking or mumbling to himself and singing in his native language, which seems not to have been understood by others, and at times of making strange and somewhat violent gestures, seems to have continued much as before. At times he was seen by the chambermaids in the corridor of the hotel, possibly on his way to the toilet, clad only in his undergarments. One of these hotel employees testified that Downey would mutter to himself while walking up and down the halls, and at times would stop and make the sign of the cross in front of or on the doors of some of the hotel rooms. One of these witnesses stated that in his muttering she heard Downey mention God, and that she thought he was repeating prayers. The testimony discloses that he was a Catholic, attended church, and observed the practices of his faith. Those who waited upon him in the restaurant testified that he generally knew what he wanted. That he ordered a variety of food either from the

menu card or on being told by the waitress what was being served; and that he never behaved in an unusual way or made any disturbance in the dining room. One waitress testified that while his clothing was dirty, ''he was neat in a way'' about his person.

While Downey was thus living at the hotel, it was purchased by the defendant, Edward F. Siller, who took possession and began operating it in January, 1928. There seems to have been no particular intimacy between Downey and Mr. Siller or the other members of the Siller family. Defendant's son Michael Siller testified that on an occasion, in November, 1928, Downey told him he would like to see the witness' father; that he wanted to talk with him about paying him a sum of money to furnish him with room, board, and the necessities of life as long as he lived and to provide for his burial. Following this request, and in response to it, both defendant and his son went to Downey's room, where Downey again stated to defendant substantially what he had previously said concerning the arrangement he wished to make for his future maintenance and burial. According to the testimony of defendant's son, Downey, upon being asked by defendant what he proposed to pay, told defendant he had a certificate of deposit which he produced and either showed to defendant or gave him the amount of it; and Downey stated he would give that amount; that he had another account at the bank but that he wished to keep that for himself. At this time, besides the certificate of deposit of $8,436.94, he had in a savings account upwards of $3,800. Following the conversation, defendant had an attorney prepare a contract, which was subsequently taken by defendant and his son to Downey's room. It was read over

to him and signed by him in the presence of Dr. Dura, who was a friend of the Siller family and at the time had stopped to call upon them. A little later defendant arranged with a justice of the peace named Little, who seems to have had experience in drafting deeds and contracts, to also come to the hotel and witness the instrument here in suit. Little testified that in compliance with this request he went to Downey's room, read the contract over to him, and asked: "Is that all right?" and deceased replied "Yes." Downey acknowledged his signature on the contract to Little, and thereupon the latter took the contract to defendant's office and subscribed his name thereto as a witness. Two weeks later the proceeds of Downey's certificate of deposit were transferred at the bank to a savings account in defendant's name. In connection with opening this savings account, a copy of the contract between Siller and deceased was filed with the bank. The account remained in this condition at the time of the trial.

As noted above, Downey died February 19, 1929, three months and five days after the contract was executed. Evidently his death from heart failure was hastened by excitement to which he was subjected incident to a fire that occurred in his room at the hotel. During the latter weeks of his life there was evidence of failing strength, and at times his meals were served to him in his room. Notwithstanding the provision in the contract that deceased was to be cared for by defendant, there is testimony that, subsequent to the consummation of the contract, deceased paid for such meals as he ate in the restaurant. Expenses of his burial were met by defendant.

It would serve no good purpose to attempt to embody in this already too lengthy recital of facts all the details in evidence bearing upon the competency or incompetency of deceased at the time he executed the contract. Some of the witnesses, in the opinion of the trial judge, were entitled to little credence. Some were materially interested in the outcome of the case; others were not. Some gave testimony of facts and circumstances constituting a reasonably sufficient foundation for an opinion testified to as to the competency or incompetency of deceased, but others expressed opinions for which but little justification appears in the testimony. After taking the testimony of these witnesses at length in open court and evidently giving it careful consideration, the trial judge came to the conclusion that Timothy Downey was mentally competent to consummate the contract here in suit. In this connection the trial judge said:

"There is no proof that any indisposition of Downey changed his mentality, or is there proof definite enough for the court to say that such indisposition occurred before the contract * * * was made. * * * The court is of the opinion that if the deceased, Timothy Downey, was mentally competent to understand the contract he made and entered into with the defendant, there can be no constructive fraud, as there was no evidence offered which shows, or tends to show, any deception or overreaching upon the part of the defendant. This leaves the only question in the case: Was the deceased, Timothy Downey, on the 14th day of November, 1928, mentally competent to dispose of a part of his property by the contract? * * * As stated, the record is barren of any evidence of actual fraud, undue influence, trickery, or dishonesty, or that the deceased

at the time he executed the contract was mentally incompetent. * * * .

"There is no allegation in the bill that Siller did not perform the contract upon his part. If he (Downey) had the mental capacity to understand the effect of the contract he was legally competent to make it, notwithstanding the opinion of witnesses to the contrary, or to the effect that he could not understand, in their opinions, the legal phraseology of the contract. * * *

"The fact that Downey died after he had been boarded, lodged, and taken care of only three months and five days after the execution of the contract is not conclusive of the inadequacy of the consideration. The testimony is that he might have lived 10 years in the condition he was in when Mr. LaBine last saw him. It may well have been in the minds of the parties at the time they met in this contract that Downey might live for that length of time and might require much care, medical attention, and medicines when sick, together with any and all necessities when desired. * * * It is not the function of the court to make a new contract for the parties, or to set aside the present contract, if the minds of the parties met in agreement."

The opinion filed by the trial judge, covering 29 pages of the printed record, carefully reviews the details of the testimony. Upon full consideration of the record presented in this court, we are constrained to hold, as did the trial judge, that the plaintiff, upon whom rested the burden of proof, has not established her right to have the contract canceled. Helpful briefs have been filed by the respective counsel, and we have given careful consideration to each argument urged in support of their conflicting contentions. Among other things, appellant's brief stresses the following: That defendant did not testify; that he secured nonresident persons as witnesses to

the contract; that the execution of the contract was not revealed to Dr. LaBine, Mr. O'Leary, or any other person friendly to the deceased; that the contract did not detail the character of maintenance or the kind of burial to be provided for deceased; that there was no particular intimacy or long acquaintance existing between defendant and the deceased; that no security insuring performance of the contract by defendant was given to Mr. Downey; that deceased, being of a miserly inclination and having refused to extend needed help to his own brother, are circumstances highly inconsistent with his having made the contract at a time when he was mentally competent; that at the time of making the contract defendant knew Downey was afflicted with heart trouble, and that (according to one witness) the defendant himself had said Downey was "crazy." Testimony of the opposite purport was introduced by defendant. Disinterested persons who had an opportunity to observe the conduct of deceased rather intimately did not observe anything indicative of abnormal mentality. It is a fair inference from the record that Mr. Downey was either estranged from any relatives he may have had or that at least he had no interest in them or they in him. In the sense in which the expression is ordinarily used, he had no "natural objects of his bounty." Dr. LaBine, whose experience and professional ability is admitted by all, and who had an excellent opportunity to observe and pass upon Downey's mentality, upon examination by plaintiff's counsel, testified that his observations of Downey "made me feel that he was not fully competent to take care of himself." His testimony is not indicative of a very marked degree of incompetency. Downey's close

friend, Henry O'Leary, testifying for plaintiff, was asked:

"Would you say that at this time (the date of the contract) Mr. Downey had mental capacity to understand this contract that he made with Mr. Siller?
"*A*.  I don't *think* he did."

Upon being further queried by counsel, the witness testified that he was "positive about that." But upon redirect examination, this witness further testified concerning Downey's condition at the time he was released from the hospital:

"He was physically well, and a great deal better than when he went to the hospital.  When he come out he was physically in good shape, in my estimation.
"*Q*.  What can you say about his mental condition?
"*A*.  I couldn't say about that.
"*Q*.  Did you ever see any difference in his mental condition during the last five or six years of his life?
"*A*.  No, sir."

Plaintiff also produced as a witness Mr. Michael Shea, one of the officers of the First National Bank of Hancock.  He testified that for 14 or 15 years Downey had come to the bank every two weeks to cash pay checks or make deposits; that on such occasions he observed deceased; and upon being asked whether he had any opinion as to whether deceased was mentally competent to enter into a contract concerning his money, the witness declined to express any belief or conviction of incompetency.  It would not be helpful to review the testimony or the claims of respective counsel more in detail.  Each case of this character must be determined in the light of the

facts established in that case. As noted before, the burden of proving incompetency was upon plaintiff. It is not sufficient merely to prove that there was opportunity to perpetrate a fraud, or that one of the parties to the contract was of less than average mentality. Nor is it of great importance that, as the situation subsequently developed, the contract seemingly worked more to the advantage of one of the parties than to the other. Had subsequent events taken a different course, an opposite result might have followed. The record before us is not such as justifies disturbing the determination of the trial judge on the issue of fact as to the mental competency of Timothy Downey at the time he executed the contract with defendant.

Appellant's brief presents the question as to whether there was error in the ruling of the trial court that the testimony of Michael Siller was not barred by the statute (3 Comp. Laws 1929, § 14219) as being equally within the knowledge of the deceased. This objection was urged on the ground that defendant's son acted as his agent, and therefore came within the terms of the statute. We think the trial judge was correct in holding that in the making of the controverted contract the testimony does not disclose that defendant's son acted as his agent; and further, that in any event the statutory bar was waived by cross-examination of this witness.

The decree entered in the circuit court is affirmed, with costs to appellee.

McDonald, C. J., and Clark, Potter, Sharpe, Fead, Wiest, and Butzel, JJ., concurred.